1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

KEVIN D DILTZ,

                  Petitioner,

    v.

JERI BOE,

                  Respondent.

Case No. C18-981-JCC-JPD

REPORT AND RECOMMENDATION

## I.  INTRODUCTION

Petitioner, a state prisoner who is currently confined at Clallam Bay Corrections Center in Clallam Bay, Washington, seeks relief under 28 U.S.C. § 2254 from a Snohomish County Superior Court judgment and sentence. Respondent has filed an answer to petitioner's habeas petition and submitted relevant portions of the state court record. Petitioner has filed a response to respondent's answer.

Having considered the parties' submissions, the balance of the record, and the governing law, the Court recommends that petitioner's habeas petition be DENIED without an evidentiary hearing, that this action be DISMISSED with prejudice, and that a certificate of appealability be DENIED as to all grounds raised in the petition.

REPORT AND RECOMMENDATION - 1

1

II.    FACTUAL AND PROCEDURAL HISTORY

2

The Washington State Court of Appeals ("Court of Appeals"), on direct appeal,

3

summarized the facts relevant to petitioner's conviction as follows:

4

At around 11:30 a.m. on April 29, 2013, Marysville Police Department Officer
Jeffrey Norris pulled over a black pickup truck on the onramp to southbound

5

Interstate 5 (I-5). As Officer Norris approached the truck, the driver, later
identified as Kevin David Diltz, drove southbound on I-5. Officer Norris ran

6

back to his patrol car and followed the truck. As Diltz drove southbound on State
Route 529, he passed a number of cars on the right-hand shoulder, often reaching

7

speeds of 95 m.p.h.

8

Diltz slowed down when he reached Everett but drove through a number of red
traffic lights and stop signs. After the truck's driveline fell off, Diltz jumped out

9

of the truck. The truck crashed into a parked vehicle, and Diltz started running
through a residential neighborhood. Officer Norris got out of his patrol car and

10

yelled, "Stop. Police," but Diltz kept running. Officer Norris ran after him.

11

While Diltz was running downhill along a sidewalk, he turned to look back at
Officer Norris and fired at least four shots. Diltz then ran behind a house and

12

jumped over a fence into a neighboring backyard. Officer Norris called dispatch
to report shots had been fired and request backup.

13

14

Marysville Police Department Officer Daniel Vinson stationed himself at a nearby
intersection while other officers set up a perimeter. Officer Vinson saw Diltz
running down an alley and pointed a rifle at him. Diltz raised his hands but then

15

turned and ran. Everett Police Department Officer Alex Soderstrom saw Diltz run
out of the alley and across a street. Officer Soderstrom pointed a rifle at Diltz and

16

told him to stop but Diltz kept running.

17

Everett Police Department Officer Shane Nelson spotted Diltz running between
two houses. Officer Nelson pointed his rifle at Diltz and threatened to shoot him

18

if he did not get on the ground. Diltz walked directly toward Officer Nelson with
his fists balled. Diltz had a large knife on his hip but did not appear to have a

19

gun. The police arrested Diltz.

20

After his arrest, the police found a brown jacket containing a cell phone in the
alley and a pair of gloves in one of the backyards but did not find the firearm

21

Diltz used to shoot at Officer Norris. A police officer identified three bullet
strikes on the concrete sidewalk where Diltz fired at Officer Norris. The officer

22

also found three 9 mm hollowpoint bullet shell casings. A few days later, a
homeowner found a fourth 9 mm shell casing in a nearby front yard.

23

REPORT AND RECOMMENDATION - 2

Detective Steve Brenneman obtained a warrant to search the black pickup truck. Inside, he found an empty gun case, a small canvas bag containing a pipe, and a pair of vice grips and a screwdriver. A Washington State Patrol Crime Laboratory (WSPCL) forensic scientist extracted DNA from the pipe found in the truck and the pair of gloves. The DNA from the pipe and the gloves matched the DNA from Diltz with a "1 in 3.4 quintillion" probability of a random match. Detective Brenneman also obtained a warrant to search the cell phone found in the jacket. The search history showed two searches on the evening of April 28 for a Ruger P89 handgun.

On May 17, the State charged Diltz with assault in the first degree and the aggravating factor of committing the assault against a law enforcement officer while armed with a firearm. The State also charged Diltz with attempting to elude a pursuing police vehicle and the aggravating factor of threatening persons other than the defendant or the pursuing officer with physical injury or harm.

On May 28, Detective Brenneman listened to recorded phone calls Diltz made from jail. During a conversation on May 15, Diltz told a friend, "I just want somebody to go get that fuckin' thing so I don't have to worry about it." On May 22, Diltz told his friend, "[A]t least you tried right?" The friend answered, "I did I even went back and tried again." In response, Diltz said, "I mean it's over with. . . . I should have just went out fuckin' blasting at 'em like I wanted to . . . then I wouldn't be here." Later in the conversation, Diltz said, "I'm pretty pissed off, but then again I only got me to be mad at, maybe I shoulda hid it better."

The next day, Detective Brenneman went back to the Everett neighborhood with a metal detector and "almost immediately" found the gun in the backyard where the pair of gloves with Diltz's DNA had been found. The Ruger model P89 9 mm semiautomatic pistol was buried under several inches of mulch. The hammer of the gun was cocked back with one live round in the chamber, but the gun was jammed. A WSPCL forensic scientist determined that all four of the 9 mm hollow-point bullet shell casings had been fired from the Ruger P89 pistol.

On July 26, the State charged Diltz by amended information with additional counts of possession of a stolen firearm, possession of a stolen vehicle, and unlawful possession of a firearm in the second degree.

*****

The jury found Diltz not guilty of possessing a stolen firearm. The jury found Diltz guilty of assault in the first degree, attempting to elude a pursuing police vehicle, possession of a stolen vehicle, and unlawful possession of a firearm in the second degree. The jury returned special verdicts finding Diltz committed the crime of assault in the first degree against a law enforcement officer while armed with a firearm, and individuals other than Diltz and Officer Norris were threatened with physical injury or harm by Diltz's actions in attempting to elude.

REPORT AND RECOMMENDATION - 3

*****

> Based on an offender score of 13 and the aggravating factors, the court imposed
> an exceptional sentence for the conviction of assault in the first degree and a high-
> end standard-range sentence for attempting to elude to run consecutively.

Dkt. 14-1 at 14-21 (footnotes omitted).

The Court of Appeals affirmed in an unpublished opinion. *Id.* at 14-25. The Washington Supreme Court denied petitioner's motion for discretionary review without comment. *Id.* at 49-113, 115. Petitioner then filed a personal restraint petition, which was unavailing at both levels of appellate review. *Id.* at 119-250, 254-259, 265-295, 315, 320-22, 324.

## III.    GROUNDS FOR RELIEF

Petitioner identifies the following grounds for habeas relief:

GROUND 1:  The prosecutor committed misconduct by (a) asking leading questions during the direct examination of Officer Norris, and during rebuttal argument (b) accusing defense witness Teresa Myer of lying, (c) fabricating evidence, and arguing that petitioner (d) "would rather not be arrested than let Officer Norris go home to breathe, see his kids," (e) was trying to become a "notorious cop killer," and (f) intended to "kill as many cops as possible."

GROUND 2:  Defense counsel provided ineffective assistance at trial by failing to object to the prosecutor's misconduct alleged in Grounds 1(a)-(d).

GROUND 3:  Appellate counsel provided ineffective assistance by failing to raise on direct appeal the instances of trial counsel's ineffectiveness alleged in Ground 2.

GROUND 4:  The cumulative errors from the prosecutor's misconduct and defense counsel's deficient performance denied him his right to a fair trial.

Dkt. 5 at 6-11, 16-18.  Respondent concedes that petitioner properly exhausted these claims in the state courts and timely filed his habeas petition.  *See* Dkt. 13 at 6.

REPORT AND RECOMMENDATION - 4

1

IV.     <u>DISCUSSION</u>

2

A.     <u>Standard of Review</u>

3

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a habeas corpus

4

petition may be granted with respect to any claim adjudicated on the merits in state court only if

5

(1) the state court's decision was contrary to, or involved an unreasonable application of, clearly

6

established federal law, as determined by the Supreme Court, or (2) the decision was based on an

7

unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d).

8

In considering claims pursuant to § 2254(d), the Court is limited to the record before the state

9

court that adjudicated the claim on the merits, and the petitioner carries the burden of proof.

10

*Cullen v. Pinholster*, 563 U.S. 170, 181-82 (2011); *see also Gulbrandson v. Ryan*, 738 F.3d 976,

11

993 (9th Cir. 2013).  "When more than one state court has adjudicated a claim, [the Court

12

analyzes] the last reasoned decision."  *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir.

13

2005) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)).

14

Under § 2254(d)(1)'s "contrary to" clause, a federal court may grant the habeas petition

15

only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a

16

question of law, or if the state court decides a case differently than the Supreme Court has on a

17

set of materially indistinguishable facts.  *See Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

18

Under the "unreasonable application" clause, a federal habeas court may grant the writ only if

19

the state court identifies the correct governing legal principle from the Supreme Court's

20

decisions, but unreasonably applies that principle to the facts of the prisoner's case.  *See id.* at

21

407-09.  The Supreme Court has made clear that a state court's decision may be overturned only

22

if the application is "objectively unreasonable."  *Lockyer v. Andrade*, 538 U.S. 63, 69 (2003).

23

The Supreme Court has further explained that "[a] state court's determination that a claim lacks

REPORT AND RECOMMENDATION - 5

1    merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the

2    correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011)

3    (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

4        Clearly established federal law, for purposes of AEDPA, means "the governing legal

5    principle or principles set forth by the Supreme Court at the time the state court render[ed] its

6    decision." *Lockyer*, 538 U.S. at 71-72.  This includes the Supreme Court's holdings, not its

7    dicta.  *Id.*  "If no Supreme Court precedent creates clearly established federal law relating to the

8    legal issue the habeas petitioner raised in state court, the state court's decision cannot be contrary

9    to or an unreasonable application of clearly established federal law." *Brewer v. Hall*, 378 F.3d

10   952, 955 (9th Cir. 2004) (citing *Dows v. Wood*, 211 F.3d 480, 485-86 (9th Cir. 2000)).

11       With respect to § 2254(d)(2), a petitioner may only obtain relief by showing that the state

12   court's conclusion was based on "an unreasonable determination of the facts in light of the

13   evidence presented in the state court proceeding."  *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005)

14   (quoting 28 U.S.C. § 2254(d)(2)); *see also Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("[A]

15   decision adjudicated on the merits in a state court and based on a factual determination will not

16   be overturned on factual grounds unless objectively unreasonable in light of the evidence

17   presented in the state-court proceedings.").  The Court presumes the state court's factual findings

18   to be sound unless the petitioner rebuts "the presumption of correctness by clear and convincing

19   evidence." *Dretke* 545 U.S. at 240 (quoting 28 U.S.C. § 2254(e)(1)).

20   B.   Ground 1: Prosecutorial Misconduct

21       When a prosecutor's conduct is placed in question, the standard of review is the "narrow

22   one of due process, and not the broad exercise of supervisory power." *Darden v. Wainwright*,

23   477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)).  To

succeed on a claim of prosecutorial misconduct, a petitioner must do more than show that "the prosecutor's remarks were undesirable or even universally condemned." *Id.* at 180-81. A petitioner must demonstrate that the prosecutor's allegedly improper remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process."[1] *Id.* at 181 (quoting *Donnelly*, 416 U.S. at 643); *see also Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.").

In order to assess a claim that a prosecutor's comments rendered a trial so fundamentally unfair as to deny a petitioner due process, it is necessary to examine the entire proceedings and place the prosecutor's statements in context. *See Greer v. Miller*, 483 U.S. 756, 765-66 (1987). In addition, habeas relief can be granted only if the prosecutor's improper comments "had substantial and injurious effect or influence in determining the jury's verdict." *Wood v. Ryan*, 693 F.3d 1104, 1113 (9th Cir. 2012) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

Petitioner claims six instances of prosecutorial misconduct. As discussed below, none of his claims prevail.

1.    *Ground 1(a): Leading Questions*

During the prosecutor's direct examination of Officer Norris, the following exchange occurred:

> Q. What happened once you gained visual of [petitioner] again? Do you know if you said anything or yelled again? Do you remember?
>
> A. I did not yell again. I continued chasing at which point he looked back at me, and I heard shots as he was looking back like this.
>
> Q. And the way you're doing that, you're not looking back. Do you want to stand up and demonstrate? If I am you and you're –

---

[1] *Darden* is the "clearly established Federal law" relating to a "prosecutor's improper comments" for purposes of AEDPA review. *Parker v. Matthews*, 132 S. Ct. 2148, 2153 (2012) (internal quotation marks omitted).

A.  So you are observing what I see?

Q.  Yes.

A.  So if I can see this.

Q.  Okay.  Does he continue to run or?

A.  Continues running, never breaks strike as I hear at least three shots.

Q.  Okay.  Did you know that he had a gun in his hand?

A.  I did not.

Q.  Okay.  *What did you think at the time that you saw him pointing back at you?*
*And just to be clear, was his arm approximately in the angle you are holding it?*
*Do you remember exactly what angle or?*

Dkt. 14-1 at 359-60 (emphasis and alteration added).

Petitioner contends that the prosecutor improperly led Officer Norris by asking, "What did you think at the time you saw him pointing back at you?"  Dkt. 5 at 16.  Petitioner argues here and in his motion for discretionary review that Office Norris did not testify that he saw petitioner pointing a gun at him until the prosecutor asked the officer what he did when he saw petitioner pointing back at him.  *See* Dkt. 19 at 9; Dkt. 14-1 at 316.  The Washington Supreme Court Commissioner concluded that the prosecutor did not lead Officer Norris because "the officer had just demonstrated what had occurred in the encounter."  Dkt. 14-1 at 316.  Relying on the portion of the transcript quoted above, the Commissioner stated, "It is reasonable to assume from this exchange that the officer made a pointing gesture during the demonstration.  As the acting chief judge [of the Court of Appeals] explained, under these circumstances Mr. Diltz fails to demonstrate that there was any improper conduct on the prosecutor's part."  *Id.* at 317 (alteration added).  The Commissioner also denied petitioner's request for a reference hearing to determine whether Officer Norris in fact pointed during his demonstration.  *Id.* at 317-18.

1    Petitioner contends that the Commissioner's conclusion that Officer Norris likely made a

2  pointing gesture was based on "rank speculation" in violation of § 2254(d)(2).  Dkt. 19 at 9, 17-

3  18.  He argues that the conclusion was unsupported by sufficient evidence in the record and that

4  the state court failed to hold a hearing to confirm whether Officer Norris made the pointing

5  motion.  *Id.* at 18.

6    The Ninth Circuit has explained that challenges under § 2254(d)(2) fall into two main

7  categories:  (1) "a petitioner may challenge the substance of the state court's findings and

8  attempt to show that those findings were not supported by substantial evidence in the state court

9  record"; and (2) "a petitioner may challenge the fact-finding process itself on the ground that it

10  was deficient in some material way."  *Hibbler v. Benedetti*, 693 F.3d 1140, 1146 (9th Cir. 2012).

11  "Regardless of the type of challenge, 'the question under AEDPA is not whether a federal court

12  believes the state court's determination was incorrect but whether that determination was

13  unreasonable—a substantially higher threshold.'"  *Id.* (quoting *Schriro v. Landrigan*, 550 U.S.

14  465, 473 (2007)).

15    In this case, the Commissioner's determination was not unreasonable.  Based on the

16  colloquy between the prosecutor and Officer Norris, it would be reasonable to conclude that

17  Officer Norris pointed during his demonstration.  Given this conclusion, the Commissioner's

18  decision to deny petitioner's request for a reference hearing also was reasonable, as was the

19  ultimate conclusion that there was no prosecutorial misconduct.  Petitioner is not entitled to

20  habeas relief on Ground 1(a).

21    2.    *Ground 1(b): Rebuttal Argument Regarding Teresa Myer*

22    During trial, defense witness Teresa Meyer testified that she saw petitioner through a

23  window of her home, and "he was pointing his gun downwards, and I heard the gunshots."  Dkt.

REPORT AND RECOMMENDATION - 9

14-1 at 672.  Ms. Myer testified that police never asked her to give a statement but she typed up her own statement the day after the event.  *Id.* at 680.

A key issue at trial was whether petitioner intended to cause great bodily harm to Officer Norris when he fired the gun.  The prosecutor argued during closing that Ms. Myer's testimony that petitioner was pointing the gun at the ground did not match up with other evidence, including the location of the bullet strikes and casings.  *Id.* at 745-46.  The prosecutor argued that the jury did not have to find that Ms. Myer was intentionally lying to conclude that "her perspective and memory are off."  *Id.*

During her closing, defense counsel argued that petitioner did not intend to shoot Officer Norris because his arm and the gun were pointed down.  *Id.* at 750.  After presenting several reasons why the jury should not believe Officer Norris's testimony regarding where petitioner was pointing the gun, defense counsel turned to Ms. Myer's testimony, reiterating that Ms. Myer saw petitioner pointing the gun at the ground and recorded what she remembered the next day. *Id.* at 762-63.

During rebuttal, the prosecutor argued:

You heard from defense counsel about Teresa Myer and what she saw and heard and witnessed.  And what did she say?  Ms. Myer says that she saw a person, when she testified, point toward the west, down to the ground, and shots fired. That is something she simply misremembers as she stood before you a year and some months later testifying.

How do you know that?  You know that because when you heard the 911 call, the dispatcher asked, "Does he have a gun?"

"No."

That's what she said as it's happening.  So you can hear the panic in her voice. "No."

In fact, the science wouldn't even indicate that anyone was standing there in the yard pointing a gun there.  West.  The three marks that were found in this

sidewalk south to north. The casings that are ejected go at about a 4 o'clock degree.

In fact, the scientist did say, in fact, that the person, the defendant, who was standing where Officer Norris thought he was when he fired, the casings are consistent with him standing in that location. Not in the yard, not by a boat. She just simply is misremembering. As time goes on, people tend to forget details, *embellish* details. But the moment she called 911, no gun.

*Id.* at 772-73 (emphasis added).

Petitioner takes issue with the prosecutor's use of the word "embellish," arguing that it is synonymous with calling Ms. Myer a liar. Dkt. 19 at 4, 10, 18-19. The Court of Appeals rejected this claim:

Diltz argues the prosecutor erred by impugning the credibility of defense witness Teresa Myer. But contrary to his claim, the prosecutor never called Myer a liar or accused her of being deliberately untruthful. Instead, the prosecutor pointed out the inconsistencies between her rendition of facts and what the other witnesses and the physical evidence said. A prosecutor has wide latitude to argue in closing any reasonable inference from the evidence, including witness credibility. *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011).

Dkt. 14-1 at 256.

Petitioner now reiterates his argument that "embellish" means "lie" or "fabricate," and that the prosecutor therefore called Ms. Myer a liar. Dkt. 19 at 10-11 (citing *Forn v. Hornung*, 343 F.3d 990, 1000 (9th Cir. 2003); *Amado v. Gonzalez*, 734 F.3d 936, 952 (9th Cir. 2013); *Taylor v. Maddox*, 366 F.3d 992, 1008 (9th Cir. 2003)). Petitioner contends that it is prosecutorial misconduct to state an opinion that a witness has lied. Dkt. 19 at 10 (citing *Detrich v. Ryan*, 740 F.3d 1237, 1257 (9th Cir. 2013)). Petitioner argues further that the prosecutor was not simply pointing out inconsistencies between Ms. Myer's testimony and other evidence because her testimony was consistent with the physical evidence and testimony of defense expert Matthew Noedel. *Id.* Petitioner also contends that the Court of Appeals' decision is based on an unreasonable determination of the facts. *Id.* at 18-19.

REPORT AND RECOMMENDATION - 11

Petitioner is not entitled to habeas relief under either § 2254(d)(1) or (d)(2).  When viewed in context, the focus of the prosecutor's argument was that Ms. Myer misremembered what occurred, pointing to inconsistencies with her 911 call and the testimony of the expert witness.  As the Court of Appeals noted, prosecutors are allowed to argue "reasonable inferences from the evidence," *United States v. Gray*, 876 F.2d 1411, 1417 (9th Cir. 1989), and the Court of Appeals reasonably concluded that the evidence supported the prosecutor's assertions.  As the Court of Appeals also found, the prosecutor did not use the word "lie," and his one-time use of "embellish," particularly when viewed in context, cannot be said to have so infected the trial with unfairness as to make petitioner's conviction a denial of due process.  Further, the Court of Appeals' decision was not based on an unreasonable determination of the facts.  Accordingly, Ground 1(b) should be denied.

3.      *Ground 1(c): Fabricating Evidence*

As noted above, defense counsel argued during closing that petitioner fired only toward the ground and not directly at Officer Norris.  *See* Dkt. 14-1 at 750, 767.  She argued that petitioner was just trying to escape and "did not try or intend to hit Officer Norris with a bullet." *Id.* at 750, 752, 768.  Counsel asserted that because the State did not prove petitioner intended to inflict great bodily injury, the jury should convict him of the lesser-included crime of assault in the second degree, rather than assault in the first degree.  *Id.* at 767-68.

In rebuttal, the prosecutor argued that the evidence showed petitioner acted with intent to cause Officer Norris great bodily injury.  First, the prosecutor pointed to evidence that petitioner grabbed the gun and a 15-round magazine before jumping out of the truck:

> When he bails out of the car, what does he have?  A gun.  He arms himself.  He is getting ready.  There's a gun case that he left in the car.  He didn't leave the gun in the gun case.  He had the gun on himself.

REPORT AND RECOMMENDATION - 12

1    The gun itself, you heard from Ryan Behr. He says with that particular gun, he
2    had three clips. Two factory clips that carried 10 rounds of ammunition, one
     extended clip that carries 15. Two sets of bullets. He called them round nosed, or
3    full metal jackets, and hollow points.

4    Just what Mr. Diltz grabbed and did at that time goes to his mindset. He didn't
     have the full metal jacket. And as you heard from the officer—the defense
5    witness that those full metal jackets will kill, but those hollow points, when they
     impact a body, spread causing significantly more damage.

6    *He didn't grab the 10-round clip. He grabbed the 15-round clip. More ammo,
     hollow-point bullets. Shows you what he was intending to do.* He was intending
7    to inflict—he didn't know who Officer Norris was at the time. He knew he was
     an officer. He was intending to inflict great bodily injury when he bailed out of
8    the car, grabbed the gun, to anybody who was going to stop him.

9    Again, make no mistake about it. When you insert a clip, a fully loaded clip in a
     9 millimeter pistol, you cock it back you put one round in the chamber, you take
10   the safeties off, you put your finger on the trigger, and you pull the trigger. There
     is no explanation other than that other than to kill, other than to cause significant
11   damage to whatever target you were going to be at.

12   *Id.* at 774-75 (emphasis added). The prosecutor also argued that the recorded phone calls from

13   jail demonstrated petitioner's intent. *Id.* at 778-89.

14         Petitioner argues that the prosecutor misled the jury into believing that petitioner

15   deliberately chose the 15-round clip with hollow bullets over a 10-round clip with round nose

16   bullets when no 10-round clip was ever introduced into evidence. Dkt. 19 at 12-13. The Court

17   of Appeals rejected this argument:

18         Ryan Behr testified that the truck being driven by Diltz had been stolen from
           him, and at the time it was stolen it contained his 9-milimeter pistol, which was
19         the one used by Diltz to fire at Officer Norris. Behr testified the truck also
           contained three clips for the pistol, two of which held "nine or ten" rounds and
20         one of which held "16 rounds." The evidence showed that the 15-round clip was
           in the pistol when Diltz fired it. During closing argument, a prosecutor has wide
21         latitude to argue all reasonable inferences from the evidence. *Thorgerson*, 172
           Wn.2d at 448. Here, the prosecutor's statement was a proper inference from the
22         evidence presented at trial.

23   Dkt. 14-1 at 256-57.

REPORT AND RECOMMENDATION - 13

1    The Court of Appeals unreasonably determined that the prosecutor's statement was based

2   on a proper inference.  Andrew Williams, a detective with the City of Everett Police Department,

3   searched the truck after the incident and testified during trial as to its contents.  *Id.* at 424-37.

4   Detective Williams testified that he found a handgun bag but no firearm or ammunition.  *Id.* at

5   433-34.  Given Detective Williams' testimony, there is no basis on which to infer that the 10-

6   round clip was in the truck during the incident and therefore no basis on which to argue that

7   petitioner chose the larger magazine with more destructive bullets when he left the vehicle to flee

8   Officer Norris.  Nevertheless, the prosecutor's improper argument did not have a "substantial

9   and injurious effect or influence in determining the jury's verdict."  *Wood*, 693 F.3d at 1113.

10  Ample other evidence supports the jury's conclusion that petitioner intended to inflict great

11  bodily injury, including the undisputed fact that he armed himself before exiting the vehicle,

12  Officer Norris's testimony that petitioner shot at him, and the recording of petitioner's call from

13  jail in which he stated, "I should have just went out fucking blasting at them like I wanted to."

14  Dkt. 14-1 at 778.  Accordingly, Ground 1(c) should be denied.

15        4.    *Ground 1(d): Rebuttal Statement Referencing Officer Norris's Children*

16    In response to defense counsel's closing argument that petitioner did not intend to harm

17  Officer Norris, the prosecutor argued:

18        Instead of stopping, he didn't break stride.  He turned, looking over his shoulder
         as Officer Norris is approaching, and he fired at least four times.
19        *****

20        He wasn't going to get caught.  He wasn't going to get arrested.  In fact, he would
         rather not be arrested than let Officer Norris go home to breathe, *see his kids.*
21
         And instead of firing once or twice or three times, which were all in the sidewalk
22        in the line and direction as Officer Norris is approaching, he fired at least four
         times.
23
     *Id.* at 777 (emphasis added).

REPORT AND RECOMMENDATION - 14

Petitioner argues that the prosecutor's reference to Officer Norris's children was highly improper and inflammatory. Dkt. 19 at 14. The Court of Appeals rejected this claim:

> But the prosecutor made this statement during rebuttal closing argument, after defense counsel argued that Diltz was merely trying to escape pursuing officers, not cause great bodily harm to Officer Norris. A prosecutor is entitled to make a fair response to the arguments of defense counsel. *State v. Brown*, 132 Wn.2d 529, 566, 940 P.2d 546 (1997). Even where the comments are improper, the remarks by the prosecutor are not grounds for reversal "if they were invited or provoked by defense counsel and are in reply to his or her acts and statements, unless the remarks are not a pertinent reply or are so prejudicial that a curative instruction would be ineffective." *State v. Russell*, 125 Wn.2d 24, 86, 882 P.2d 747 (1994).

Dkt. 14-1 at 256.

The Court does not agree with the Court of Appeals that the prosecutor's reference to Officer Norris's children was a fair response to or invited by defense counsel's arguments, but it cannot say that the Court of Appeals' determination was objectively unreasonable. Furthermore, even if the state court's determination was objectively unreasonable, the prosecutor's statements did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Wood*, 693 F.3d at 1113. Officer Norris had testified that being shot at put him in fear of leaving his children behind, Dkt. 14-1 at 368, the prosecutor only referenced Officer Norris's children one time, and as discussed above, there was ample other evidence in the record of petitioner's intent to inflict great bodily injury. Accordingly, Ground 1(d) should be denied.

5.    *Grounds 1(e) and (d): Rebuttal Argument Regarding Killing Cops*

During rebuttal, the prosecutor argued that the recorded phone calls from jail demonstrated petitioner's intent to harm Officer Norris:

> I think the most critical piece of information comes from the defendant himself. You heard those recorded phone calls. You heard him say, and I quote, "I should have just went out fucking blasting at them like I wanted to."
>
> *****

1

2

> That shows you his intent, what he wanted to do. *He wanted to kill as many cops, specifically Officer Norris, on that day as he could.* That's what he wanted.

3    *Id.* at 778-79 (emphasis added). The prosecutor also pointed out that the central issue for the

4    jury to decide was petitioner's intent when he pulled the trigger, not his motivation:

5

6

> That's the one issue you have to decide in this case. The time he took that gun, the time he fired it at Officer Norris, and what was his intent. Not what was his motivation behind it, was he trying to flee, *was he trying to become a notorious cop killer.* What was his intent when he shot at Officer Norris?

7

8    *Id.* at 779 (emphasis added).

9        Petitioner's counsel moved for a mistrial, arguing that these statements were

10   inflammatory. *Id.* at 785. The trial court denied the motion, and the Court of Appeals affirmed:

11

12

> The [trial] court denied the motion for a mistrial, finding the statements were based on reasonable inferences from the evidence, relevant to the State's burden to prove intent, and not flagrant or ill intentioned. The court's findings state, in pertinent part:

13

14

> 1. As part of the First Degree Assault charge in this case, the State was required to prove that the defendant intended to cause Officer Norris great bodily harm, a term that includes bodily injury that creates a probability of death.

15

16

> 2. Evidence and arguments derived from that evidence, related to what the defendant was thinking at the time he fired a gun at Officer Norris were relevant and admissible to prove the defendant's intent.

17

18

> 3. During trial, the jury heard a recorded phone call made by the defendant in which he said, "I should have just went out fucking blasting at 'em like I wanted to" when discussing the incident involving Officer Norris.

19

20

> 4. There was also evidence presented at trial that the defendant fired in the direction of Officer Norris at least 3-4 times and, when told he needed to stop or would be shot, the defendant laid down on the ground.

21

22

> 5. The State's argument that the defendant "wanted to kill as many cops, specifically Officer Norris, on that day as he could" was a reasonable inference from the evidence presented at trial and was directly relevant to the defendant's intent when firing the gun in [O]fficer Norris' direction.

23

REPORT AND RECOMMENDATION - 16

6.  The State's argument that the [S]tate did NOT have to prove the defendant's motivation behind his intent "Not what was his motivation behind it, was he trying to flee, was he trying to become a notorious cop killer? What was his intent when he shot at Officer Norris" was also relevant to the State's burden to prove intent and the difference between intent and the motive behind the intent.

7.  Neither of the above statements were any more inflammatory than the evidence that was presented at trial and neither were flagrant or ill intentioned.

The record supports the [trial] court's finding that the prosecutor's argument that Diltz "wanted to kill as many cops, specifically Officer Norris, on that day as he could" was based on reasonable inferences from the evidence at trial.  The evidence showed that in order to have more ammunition, Diltz chose to take the 15-round magazine instead of the 10-round magazine when he grabbed the gun and jumped out of the moving truck.  The testimony and forensic evidence showed Diltz fired the gun at least four times in the direction of Officer Norris. And, without objection, the State presented the recording of the phone call from jail where Diltz said he wanted to "just [go] out fuckin' blasting at 'em."

The record supports the court's finding that the prosecutor's argument that the State "did NOT have to prove" Diltz's motive, including whether he was "trying to flee" or "trying to become a notorious cop killer," was not improper or inflammatory.  The distinction between intent and motive was particularly important because the defense argued the State did not prove Diltz intended to inflict great bodily harm because his motive was simply to get away.[2]  And as the [trial] court points out, the statement was "relevant to the State's burden to prove intent and the difference between intent and the motive behind the intent." *See State v. Boot*, 89 Wn. App. 780, 789, 950 P.2d 964 (1998) (the State is not required to prove motive as an essential element of the crime).

*Id.* at 23-24 (some alterations in original, some added).

Petitioner does not address these claims in his traverse, and the Court finds that he is not entitled to habeas relief under either § 2254(d)(1) or (d)(2).  Although the Court of Appeals incorrectly referenced the 10-round magazine, any error in doing so was not prejudicial for the reasons discussed above with respect to Ground 1(c).  Furthermore, the state court determination

---

[2] [Court of Appeals footnote 3] In addition, the jury instructions specifically state that the jury is to "act impartially," to "not let your emotions overcome your rational thought process," and to "disregard any remark, statement, or argument that is not supported by the evidence or the law in [the court's] instructions."

REPORT AND RECOMMENDATION - 17

1  was neither contrary to nor an unreasonable application of clearly established federal law.

2  Accordingly, Grounds 1(e) and (f) should be denied.

3  C.    Ground 2: Ineffective Assistance of Trial Counsel

4       The Sixth Amendment guarantees a criminal defendant the right to effective assistance of

5  counsel. *Strickland v. Washington*, 466 U.S. 668 (1984). Claims of ineffective assistance of

6  counsel are evaluated under the two-prong test set forth in *Strickland.* Under *Strickland*, a

7  defendant must prove that (1) counsel's performance was deficient and (2) the deficient

8  performance prejudiced the defense. *Id.* at 687.

9       With respect to the first prong of the *Strickland* test, a petitioner must show that counsel's

10  performance fell below an objective standard of reasonableness. *Id.* at 688. Judicial scrutiny of

11  counsel's performance must be highly deferential. *Id.* at 689. "A fair assessment of attorney

12  performance requires that every effort be made to eliminate the distorting effects of hindsight, to

13  reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from

14  counsel's perspective at the time." *Id.* In order to prevail on an ineffective assistance of counsel

15  claim, a petitioner must overcome the presumption that counsel's challenged actions might be

16  considered sound trial strategy. *Id.*

17       The second prong of the *Strickland* test requires a showing of actual prejudice related to

18  counsel's performance. In order to establish prejudice, a petitioner "must show that there is a

19  reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

20  would have been different. A reasonable probability is a probability sufficient to undermine

21  confidence in the outcome." *Id.* at 694. "That requires a 'substantial,' not just 'conceivable,'

22  likelihood of a different result." *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (quoting

23  *Harrington v. Richter*, 562 U.S. 86, 104 (2011)).

1    While the Supreme Court established in *Strickland* the legal principles that govern claims

2    of ineffective assistance of counsel, it is not the role of the federal habeas court to evaluate

3    whether defense counsel's performance fell below the *Strickland* standard. *Richter*, 562 U.S. at

4    101. Rather, when considering an ineffective assistance of counsel claim on federal habeas

5    review, "[t]he pivotal question is whether the state court's application of the *Strickland* standard

6    was unreasonable." *Id.*; *see also Burt v. Titlow*, 134 S. Ct. 10, 18 (2013). "A state court must be

7    granted a deference and latitude that are not in operation when the case involves review under

8    the *Strickland* standard itself." *Richter*, 562 U.S. at 101. Thus, federal habeas review of a state

9    court's adjudication of an ineffective assistance of counsel claim is "doubly deferential."

10   *Pinholster*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 566 U.S. 111, 123 (2009)).

11   Petitioner argues that trial counsel was ineffective because she failed to object to or

12   request a curative instruction for the alleged instances of prosecutorial misconduct raised in

13   Grounds 1(a)-(d). Dkt. 5 at 17-18. The Court of Appeals rejected this claim because petitioner

14   had not shown any prosecutorial misconduct or resulting prejudice that had a substantial

15   likelihood of affecting the jury's verdict. Dkt. 14-1 at 258.

16   In light of the discussion above that the state court reasonably concluded that there was

17   no prosecutorial misconduct in Grounds 1(a), (b), and (d), the Court of Appeals reasonably

18   concluded that petitioner's trial counsel was not ineffective for failing to object in these

19   instances. The Court of Appeals also reasonably concluded that there was no prejudice. With

20   respect to the misconduct alleged in Ground 1(c), given that there was no resulting prejudice

21   from the prosecutor's improper argument, the Court of Appeals reasonably found a lack of

22   prejudice for the ineffective assistance of trial counsel claim. Petitioner makes no persuasive

23   argument otherwise. Accordingly, Ground 2 should be denied.

1    D.    Ground 3: Ineffective Assistance of Appellate Counsel

2    "A criminal defendant enjoys the right to the effective assistance of counsel on appeal."

3    *Hurles v. Ryan*, 752 F.3d 768, 785 (9th Cir. 2014) (citing *Evitts v. Lucey*, 469 U.S. 387, 391-97

4    (1985)).  Courts consider claims of ineffective assistance of appellate counsel under the

5    *Strickland* standards set forth above.  *Id.*  Thus, petitioner "must show that appellate counsel's

6    representation fell below an objective standard of reasonableness, and that, but for counsel's

7    errors, a reasonable probability exists that he would have prevailed on appeal."  *Id.*  The failure

8    of appellate counsel to raise meritless or weak issues does not constitute ineffective assistance of

9    counsel.  *See Jones v. Barnes*, 463 U.S. 745, 751-52 (1983) (holding that appellate counsel does

10   not have an obligation to raise every nonfrivolous argument); *Miller v. Keeney*, 882 F.2d 1428,

11   1428 (9th Cir.1989) (holding that appellate counsel's failure to raise a weak issue did not

12   constitute ineffective counsel).

13   Petitioner argues that appellate counsel was ineffective for failing to raise on direct

14   appeal any of the instances of ineffectiveness raised in Ground 2.  The Court of Appeals found

15   that appellate counsel reasonably decided to omit petitioner's prosecutorial misconduct claims

16   because they were not meritorious.  Dkt. 14-1 at 259.  For the same reasons discussed above with

17   respect to Ground 2, petitioner's ineffective assistance of appellate counsel claim fails.  Ground 3

18   should be denied.

19   E.    Ground 4: Cumulative Error

20   "[T]he combined effect of multiple trial court errors violates due process where it renders

21   the resulting criminal trial fundamentally unfair."  *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir.

22   2007) (citing *Chambers v. Mississippi*, 410 U.S. at 298, 302-03 (1973) (combined effect of

23   individual errors "denied [Chambers] a trial in accord with traditional and fundamental standards

of due process" and "deprived Chambers of a fair trial")). "The cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal." *Id.* (citing *Chambers*, 410 U.S. at 290 n.3).

In this case, petitioner has established one non-prejudicial error. *See infra* § IV.A.3 (Ground 1(c)). Given that there were no other errors, "there is nothing to accumulate to a level of a constitutional violation." *Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002), *overruled on other grounds by Slack v. McDaniel*, 529 U.S. 473 (2000). Thus, Ground 4 should be denied.

F.    Evidentiary hearing

Petitioner asks the Court to hold an evidentiary hearing. Dkt. 19 at 3-5, 23-28. Because his claims can be resolved by reference to the state court record, an evidentiary hearing is not necessary. *See Totten v. Merkle*, 137 F.3d 1172, 1176 (9th Cir. 1998) ("[A]n evidentiary hearing is not required on issues that can be resolved by reference to the state court record.").

V.    CERTIFICATE OF APPEALABILITY

A petitioner seeking post-conviction relief under § 2254 may appeal a district court's dismissal of his federal habeas petition only after obtaining a certificate of appealability from a district or circuit judge. A certificate of appealability may issue only where a petitioner has made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3). A petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Under this standard, the Court concludes that that petitioner is not entitled to a certificate of appealability with respect to any of his grounds for relief.

1

VI.     <u>CONCLUSION</u>

2      The Court recommends petitioner's habeas petition be DENIED without an evidentiary

3  hearing and this action be DISMISSED with prejudice.  The Court further recommends that a

4  certificate of appealability be DENIED as to all of the claims raised in this action.  A proposed

5  order accompanies this Report and Recommendation.

6      Objections to this Report and Recommendation, if any, should be filed with the Clerk and

7  served upon all parties to this suit by no later than **March 20, 2019**.  Failure to file objections

8  within the specified time may affect your right to appeal.  Objections should be noted for

9  consideration on the District Judge's motion calendar for the third Friday after they are filed.

10  Responses to objections may be filed within **fourteen (14)** days after service of objections.  If no

11  timely objections are filed, the matter will be ready for consideration by the District Judge on

12  **March 22, 2019.**

13      This Report and Recommendation is not an appealable order.  Thus, a notice of appeal

14  seeking review in the Court of Appeals for the Ninth Circuit should not be filed until the

15  assigned District Judge acts on this Report and Recommendation.

16      Dated this <u>26th</u> day of <u>February</u>, 2019.

17

18  _____

19  JAMES P. DONOHUE
    United States Magistrate Judge

20

21

22

23

REPORT AND RECOMMENDATION - 22